Filed 3/24/26  P. v. Fechner CA3

<u>NOT TO BE PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE, | C102315 |
| Plaintiff and Respondent, | (Super. Ct. No. 62-187283) |
| v. | |
| MARC PATTERSON FECHNER, | |
| Defendant and Appellant. | |

After a jury trial, defendant Marc Patterson Fechner was convicted of infliction of a corporal injury on a dating partner, Amanda A.  On appeal, Fechner contends his constitutional rights were violated by the absence of jury instructions on self-defense, defense of property, the right to eject a trespasser, and the definition of trespassing. Fechner also contends the court erred in admitting evidence of a prior incident of domestic violence then further erred in failing to adequately instruct the jury on the prior crimes evidence.  We disagree and thus affirm.

## LEGAL AND FACTUAL BACKGROUND

Amanda began dating Fechner in August 2021. After two to three weeks of dating, Amanda, who only lived a few minutes away, began to spend nearly every night at Fechner's house and kept many of her personal items there. Amanda had an access code to the front door of Fechner's home as well as a key.

June 25, 2022—Count One

On the evening of June 25, 2022, Fechner and Amanda fought over the phone. Amanda told Fechner that she was coming over, getting her things, and was "done." When Amanda arrived at Fechner's house, they began to argue. Amanda told Fechner, "I'm getting my shit and I'm done." Fechner told Amanda not to go into the house. Ignoring him, she went into the house to retrieve her personal items. Fechner grabbed Amanda from behind and, according to her, threw her against the wall and knocked her to the ground. Amanda struggled to protect herself while she fell. Fechner grabbed Amanda's hands and legs to drag her out of the house. Amanda kicked and screamed as Fechner dragged her outside. Once out of the house, Fechner threw her shoe at her and told her to "get the fuck out of here." Amanda sustained bruising, road rash, and a large scrape on her back.

That night, she called law enforcement. She reported the details of Fechner's conduct and the injuries she sustained, but she did not name Fechner as the perpetrator. The same night, Fechner called Amanda and left a voicemail accusing her of breaking into his house. The next day, Fechner sent Amanda an e-mail that stated, in part, "I'm sorry I had to stand my ground. I hope you understand that it was not important for you to gain access to my home and that my gun was out in the open on my nightstand. Setting aside the feeling of having someone decide that they have the freedom to enter my home without my consent, I was mostly in fear that you . . . only wanted inside the house to make a scene." The e-mail continued, "All I could make of it and see was you

seeing the gun in the bedroom and doing something stupid again. That's all I really see in my head when you get angry, and it tortures me. I'm sorry I had to stop you."

Amanda was familiar with the unsecured firearms in Fechner's home and had her own firearm and concealed carry permit. When asked by defense counsel about an incident about a month before the June 25 incident, Amanda specifically denied that she acted erratically with a firearm and pointed it at herself.

July 31, 2022—Count Two

Shortly after the June 25, 2022, incident, Amanda went to stay in North Carolina where her mother and sisters lived. While Amanda was there, Fechner reached out to her, and the two began to reconnect. Amanda decided to return to California but when she did so, she was unexpectedly denied access to the house she had been living in for several years. Fechner took her in. She lived with him from July 12, 2022, until August 1, 2022. During this time, she often stayed at Fechner's house alone while he was at work and had the code to the front door as well as a key.

On July 31, 2022, Amanda sat outside in Fechner's backyard by the fire pit while Fechner did yard work. Both Amanda and Fechner were drinking throughout the day. At some point in the evening, Amanda and Fechner got into a disagreement and Fechner told her she had 10 minutes to get out of his house. Fechner then went inside and when Amanda tried to go inside, the door was locked. When Amanda asked Fechner to let her back in the house, he opened the door and asked if she was "going to behave." Amanda said, "no." She remained on the back patio, and through the screen of an open window, saw that Fechner had used her phone to call her mother. Upset at the fact that Fechner was involving her mother, Amanda "went off on him," "cussing at him."[1] The two

---

[1] The prosecution introduced two surveillance videos of this incident. Exhibit No. 12 includes the audio of the incident. Exhibit No. 13 does not contain audio, and the footage is slowed down and zoomed in on Amanda.

argued through the screen. Amanda said that as she spoke to Fechner, she might have hit the screen causing it to fall forward, hitting her. She then unsuccessfully tried to climb inside the window. As she reached through the open screen to grab her phone, Fechner punched her in the face.[2]

At some point, Amanda managed to get back into the house and retrieve her phone. Amanda texted a friend that Fechner punched her in the face and the friend contacted law enforcement. Fechner also contacted law enforcement after the incident. He reported that Amanda broke through the window screen and crawled into the house. When asked by the dispatcher if Amanda was injured, Fechner responded, "I don't know why she would've been. No." Sherriff's Deputy Ty Parkes was the first deputy to respond to the scene. He noted Amanda's right eye was swollen and likely required medical attention.

Deputy Parkes was unable to separate Fechner and Amanda to speak to Amanda privately about her injuries. After another deputy arrived, Deputy Parkes took a statement from Fechner, which was recorded by his in-car camera microphone. Deputy Parkes offered, "if she was trying to come in and you were trying to prevent her from coming in, that's fine." Fechner responded, "Well . . . not even, it's dark." Fechner denied hitting Amanda.

A jury found Fechner guilty of one misdemeanor and one felony count of infliction of a corporal injury on a dating partner (Pen. Code, § 273.5, subd. (a) (counts one & two, respectively). The jury found Fechner not guilty of resisting a peace officer (Pen. Code, § 148, subd. (a) (count three)). The trial court placed Fechner on formal probation for four years, and as a term of probation, imposed 180 days in county jail.

Fechner timely filed a notice of appeal.

---

[2]   As a result, Amanda had a black eye for around a month and a half after the incident.

DISCUSSION

At the outset, we note that it is a "fundamental principle of appellate procedure that a trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment. [Citations.] 'This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' " (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609.) "It is the responsibility of the appellant, here [Fechner], to support claims of error with meaningful argument and citation to authority. [Citations.] When legal argument with citation to authority is not furnished on a particular point, we may treat the point as forfeited and pass it without consideration." (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52; see also *Woods v. Horton* (2008) 167 Cal.App.4th 658, 677 ["A court need not consider an issue where reasoned, substantial argument and citation to supporting authorities are lacking"]; *Wright v. City of Los Angeles* (2001) 93 Cal.App.4th 683, 689 ["asserted grounds for appeal that are unsupported by any citation to authority and that merely complain of error without presenting a coherent legal argument are deemed abandoned and unworthy of discussion"].) As we note below, there are multiple instances where Fechner summarized the applicable general law but failed to provide reasoned argument with supporting legal authorities on the particular point he has raised. " '[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration. [Citations.]' [Citations.] This principle is especially true when an appellant makes a general assertion, unsupported by specific argument, regarding insufficiency of evidence." (*People v. Stanley* (1995) 10 Cal.4th 764, 793.) We may " 'disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions

5

he wants us to adopt.' " (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153.)

Fechner also frequently fails to adequately cite evidence in the record when advancing his claims. " ' "An appellant challenging the sufficiency of the evidence to support the judgment must cite the evidence in the record supporting the judgment and explain why such evidence is insufficient as a matter of law. [Citations.] An appellant who fails to cite and discuss the evidence supporting the judgment cannot demonstrate that such evidence is insufficient." ' " (*Vendor Surveillance Corp. v. Henning* (2021) 62 Cal.App.5th 59, 76-77.)

I

Affirmative Defenses

Fechner contends substantial evidence supported the theories of self-defense, defense of property, and the right to eject a trespasser as to both counts one and two. He argues that the trial court erred and/or counsel provided ineffective assistance by failing to ensure the jury was instructed on each of these defenses, thereby depriving it of the ability to fully consider the issues at trial. We disagree.

A. Additional Background

During the jury instruction conference, the parties discussed the elements of inflicting corporal injury on a partner, as described by CALCRIM No. 840. This pattern instruction requires that, when the court instructs on self-defense or defense of another, CALCRIM No. 840 must also include a third element instructing that the prosecution must prove that a defendant did not act in self-defense or defense of another when he or she willfully inflicted physical injury on a dating partner that resulted in a traumatic condition.

In discussing the applicability of this third element, the trial court stated, "I don't think the theory in this case is self-defense, but I know the defense is asking for instructions on defense of home; right?" Defense counsel responded, "Yes. And I think

6

it's appropriate to put there. We may need to change it from self-defense to defense of home." The prosecutor objected to modifying the pattern instruction, asserting it was not appropriate to insert concepts related to a right to eject a trespasser within CALCRIM No. 840, because the right to self-defense or defense of another is "very different" from the right to eject a trespasser. The prosecutor asserted that the right to eject a trespasser would be more appropriately addressed through CALCRIM No. 3475, which the defense requested. The trial court declined to modify the language in CALCRIM No. 840, finding that CALCRIM No. 3475 would adequately address Fechner's right to eject a trespasser as a defense. The trial court did not instruct on the third element in CALCRIM No. 840.

With respect to CALCRIM No. 3475, the court granted Fechner's request for the instruction, which explains the right of a homeowner to use reasonable force to eject a trespasser. The trial court inquired, "Count Two, he was calling, saying there was a trespasser; right?" Defense counsel responded, "That's not my theory, Judge. And I wrote it on the bottom of my proposed instruction that it says Count One. The theory for Count Two is entirely different." The trial court granted Fechner's request to apply the right to eject a trespasser instruction only to count one and, while instructing the jury, said, "this applies to Count One. Okay?"

In closing argument, with respect to count one (June 25 incident) defense counsel argued that when Amanda came over, she was not living there or staying the night or even a guest. When Fechner told her not to enter his home, she became a trespasser when she disregarded him and entered the house. Counsel further argued that Amanda was a safety concern because she has a tendency toward "emotional outbursts" and drinking to excess while possessing knowledge of all of Fechner's firearms. Counsel argued that Fechner had an absolute right to use reasonable force to stop her from trespassing, which he did when he grabbed her then pulled her out of the house by her leg after she fell to the floor and began kicking and screaming.

7

With respect to count two (July 31 incident), defense counsel asserted that it was physically impossible for Fechner to punch her from his position inside the house and that Amanda, who had been drinking, accidentally hit and injured her own face on the windowsill as she attempted to throw a punch inside the window. Counsel urged the jury to view the video recording as proof that Amanda's injuries were self-inflicted.

In discussing the elements of the offense, counsel noted that the prosecution had to prove that Fechner acted willfully and unlawfully in inflicting injuries on Amanda. Counsel continued, "In count one, which is the June 25th incident, the legal justification is, is that [Amanda] was trespassing, and he had a right—absolute right under the law to take her out of the house using reasonable force. [¶] The willfully, unlawfully, the part in Count Two, the July 31st is, is that it wasn't willful because he didn't do it. You don't even need to think about unlawfully because he didn't do it. It wasn't willful because he didn't do it in Count Two."

During deliberation, the jury asked the following question regarding the right to eject a trespasser: "What is considered 'poses a threat to the owner.' Is that solely physical, or can it be his ego to where it impacts him mentally/and or emotionally[?]" With the agreement of the parties, the court's answer acknowledged the term "threat" is not specifically defined in CALCRIM No. 3475 and referred the jury to CALCRIM No. 200, which states, "Words and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings."

B. Analysis

" 'In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case.' " (*People v. Anderson* (2011) 51 Cal.4th 989, 996.) While the prosecution has the burden of proof beyond a reasonable doubt for every element of the offense, justification and excuse are affirmative defenses and the defendant has the burden of raising them. (See *People v. Neidinger* (2006) 40 Cal.4th 67,

8

72 [it is constitutionally permissible to place on the defendant the burden of proving affirmative defenses, as long as the defendant is not required to negate an element of the offense].) " 'A trial court's duty to instruct, sua sponte, on particular defenses arises " 'only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' " ' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1052.)[3] "Of course, even if the defendant requests instruction on a defense, the trial court need not give the instruction if it is not supported by substantial evidence." (*People v. Villanueva* (2008) 169 Cal.App.4th 41, 49; see also *People v. Memro* (1995) 11 Cal.4th 786, 868 [a party is not entitled to an instruction on a theory for which there is no substantial evidence].) "In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt.' " (*People v. Salas* (2006) 37 Cal.4th 967, 982.) We review de novo a trial court's failure to give an affirmative defense instruction. (*People v. Simon* (2016) 1 Cal.5th 98, 133.)

    *i. June 25—Count One*[4]

    Fechner contends the court had a sua sponte duty to instruct the jury on the theories of self-defense and defense of property because he reasonably relied on them at trial, the theories were not inconsistent with his defense, and substantial evidence supported them. He alternatively contends that counsel provided ineffective assistance

---

**3**    A trial court's duty to instruct on defenses is "less expansive" than its "relatively broad duty" to instruct on lesser included offenses where the court must instruct whenever there is substantial evidence to support the instruction. (*People v. Barton* (1995) 12 Cal.4th 186, 197; see also *People v. Elize* (1999) 71 Cal.App.4th 605, 615 (*Elize*).)

**4**    Fechner refers to this as the "June 24" incident.

by failing to request the instructions. We disagree on all fronts. Fechner neither relied on them, nor did the evidence support giving them.

With respect to self-defense as applied to count one, we conclude that Fechner invited any error by his express refusal of the instruction in favor of a different trial strategy. In cases involving an action affirmatively taken by defense counsel, a clearly implied tactical purpose is sufficient to invoke the invited error rule. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49.) Here, counsel did not merely acquiesce but affirmatively rejected that the instruction should be given. (Cf. *People v. Smith* (1992) 9 Cal.App.4th 196, 207, fn. 20 ["merely acceding to an erroneous instruction does not constitute invited error"]; *People v. Mason* (2013) 218 Cal.App.4th 818, 824 [invited error does not apply where the court cannot definitively conclude that trial counsel made a deliberate tactical choice by not objecting to the jury instruction].) Fechner may not now complain that the court did exactly what he insisted upon. (*People v. Cooper* (1991) 53 Cal.3d 771, 827.)

Fechner disputes this conclusion and contends that there "was no 'clearly implied' tactical purpose for defense counsel's failure to request a self-defense instruction" because "there was no downside whatsoever" to requesting the instruction. Credibility with the jury is always a tactical consideration. (See *People v. Gamache* (2010) 48 Cal.4th 347, 394.) As we explain, the evidence shows that Fechner was the first to use physical force during the June 25 incident and there was no evidence to support a claim of self-defense. However, Fechner could, and did, ask the jury to consider his right to eject Amanda as a trespasser as justification for his use of force against her. This was a strategy justified and informed by the facts of the case.

To justify an act of self-defense in the nonhomicide context, a defendant must " 'have an honest and reasonable belief that bodily injury is about to be inflicted.' " (*People v. Minifie* (1996) 13 Cal.4th 1055, 1064 (*Minifie*).) On appeal, Fechner claims that Amanda posed a safety concern because of the combination of "how she acts" and

10

her knowledge of his firearms and that he "acted reasonably in defending himself and his home from [Amanda] who was violently 'kicking and screaming.' " But the uncontradicted evidence is that it was Fechner who initiated the use of physical force when he grabbed Amanda and slammed her against the wall after she entered his home against his wishes. "It is well established that the ordinary self-defense doctrine— applicable when a defendant reasonably believes that his safety is endangered—may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified." (*In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1.) Fechner fails to account for or mention his own conduct in initially grabbing Amanda *before* she kicked or screamed.

In failing to do so, he violates two established rules of appellate practice. First, an appellant must fairly set forth all the significant facts, not just those beneficial to him or her.[5] (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881; *In re S.C.* (2006) 138 Cal.App.4th 396, 402; see also Cal. Rules of Court, rule 8.204(a)(2)(C) [the appellant's opening brief must "[p]rovide a summary of the significant facts limited to matters in the record"].) Second, Fechner fails to cite to any legal authority or explain why, based on *all* the facts of this case, his proposed instructions were warranted.[6] " 'Where a point is merely asserted by counsel without any argument of or authority for

---

[5] Although Fechner states his intent to "incorporate[] by reference" his statement of facts concerning the June 25 incident, his statement of facts also fails to reflect that Amanda testified that Fechner grabbed her from behind and slammed her against the wall before she ended up on the floor kicking and screaming.

[6] Indeed, Fechner references CALCRIM No. 3470, which governs the "Right to Self-Defense or Defense of Another," but does not explain why CALCRIM No. 3471, which governs the "Right to Self-Defense: Mutual Combat or Initial Aggressor" would not equally apply under his argument.

11

its proposition, it is deemed to be without foundation and requires no discussion.' " (*People v. Dougherty* (1982) 138 Cal.App.3d 278, 282.)

Nevertheless, our review of the record reveals no evidence that Fechner had an honest and reasonable belief that Amanda posed an imminent threat of inflicting bodily injury on him when he initiated physical force. Fechner has cited no evidence of past threats or infliction of harm by Amanda and there is nothing about this particular incident that signaled a threat by her. (Cf. *Minifie, supra*, 13 Cal.4th at p. 1068 [the combination of third party threats and the victim's act of punching the defendant in the face before grabbing crutches may support a claim of self-defense].) Fechner's voicemail after the encounter simply accused her of breaking into his house. In his e-mail sent after the encounter, he stated, "I was mostly in fear you only wanted . . . inside the house to make a scene" and "All I can make of it and see was you seeing that gun in the bedroom and doing something stupid again." Without more, we cannot speculate that the phrase "doing something stupid again" refers to a threat of violence against Fechner. (Cf. *People v. Sakarias* (2000) 22 Cal.4th 596, 620 [" 'Speculation is an insufficient basis upon which to require the trial court to give an instruction on a lesser included offense' "].)

For similar reasons, we conclude there is not substantial evidence to support the theory of defense of property with respect to the June 25 incident. CALCRIM No. 3476, the jury instruction regarding the right to defend personal property, explains that an owner of property "may use reasonable force to protect that property from imminent harm." (See also *Minifie, supra*, 13 Cal.4th at p. 1064 [a threatened wrongful injury "must be imminent" to trigger the right to defend].) Without citing to any evidence, Fechner speculates that Amanda's "unpredictable behavior and history of intoxication" posed a threat to his property. (See *L.O. v. Kilrain* (2023) 96 Cal.App.5th 616, 620 [a party forfeits their specific argument by failing to set forth the evidence offered to

12

support the challenged ruling].)  Here, there was simply no evidence to support that claim.

Because there was insufficient evidence to support the theory of self-defense or defense of property with respect to count one, the trial court had no sua sponte duty to instruct the jury on these theories.  (See *People v. Salas, supra*, 37 Cal.4th at p. 982.) Under these circumstances, the failure to instruct the jury on these defenses did not affect Fechner's substantial rights.  (See *People v. Jimenez* (2016) 246 Cal.App.4th 726, 730 [ascertaining whether purported instructional error affected the defendant's substantial rights necessarily requires an examination of the merits of the claim].)  For the same reasons, we cannot fault defense counsel for failing to seek either instruction for count one.  (Cf. *People v. Kearns* (1997) 55 Cal.App.4th 1128, 1135 [rejecting claim that trial counsel provided ineffective assistance by failing to request necessity instruction because the "evidence was insufficient to permit a reasonable jury to find that [the] elements [of the necessity defense] were established and thus neither the trial court nor defense counsel committed error"]; *People v. Pepper* (1996) 41 Cal.App.4th 1029, 1038 ["Since [the] defense[] of necessity . . . w[as] not available to defendant as a matter of law, we reject his related claim[] that . . . he received ineffective assistance of counsel when his trial attorney did not request instruction on the defense[] to which we have concluded he was not entitled"].)  "Counsel cannot have been ineffective for failing to seek an instruction for which there was no supporting evidence:  the court should properly have denied such a request." (*People v. Ochoa* (1998) 19 Cal.4th 353, 434.)

Contrary to Fechner's claim, the fact that the jury sought clarification on the "threat" element of the right to eject a trespasser does not warrant a different conclusion. The jury asked whether the phrase "poses a threat to the owner" refers to a physical or emotional threat.  While Fechner's view is that the "additional defense instructions . . . would have been consistent with the jury's focus," he fails to provide any authority or argument as to whether the jury's question alone triggered a legal obligation to instruct

13

on the additional theories. Under the circumstances here, it does not. "A party is not entitled to an instruction on a theory for which there is no supporting evidence." (*People v. Memro, supra*, 11 Cal.4th at p. 868.)

Instead, the only defense supported by the evidence regarding count one was based on Fechner's right to eject a trespasser. Undoubtedly, defense counsel came to the same conclusion as he sought to apply that theory alone to count one. The court agreed that the instruction was warranted and, with CALCRIM No. 3475 as a guide, it was for the jury to decide whether Fechner's actions were justified by exercising his right to eject Amanda as a trespasser. Although Fechner contends, "[t]here was also error by failing to define trespass, which was essential for the jury to apply the defense of trespasser ejection," this issue was waived at trial as the record reflects counsel approved the court's answer. (See *People v. Hughes* (2002) 27 Cal.4th 287, 402 [counsel's agreement with the court's response waives the issue on appeal].) The issue is also waived on appeal because Fechner fails to cite any legal authority or provide any legal argument on it. (*People v. Stanley, supra*, 10 Cal.4th at p. 793 [failure to cite authority waives appellate review of issue].)

### ii. July 31—Count Two

Fechner raises similar contentions with respect to the July 31 incident. As with count one, we conclude that any error associated with the failure to instruct on self-defense or Fechner's right to eject a trespasser on count two was invited. At trial, defense counsel expressly rejected those theories as inapplicable to count two and instead denied that Fechner used any force against Amanda that night. " 'When a defense attorney makes a "conscious, deliberate tactical choice" to [request or] forego a particular instruction, the invited error doctrine bars an argument on appeal that the instruction was [given or] omitted in error.' " (*People v. McKinnon* (2011) 52 Cal.4th 610, 675.)

We also agree with the People that the alternative defense theories, including defense of property (otherwise not included in the application of the invited error

14

doctrine), would have been inconsistent with Fechner's trial strategy and were not supported by substantial evidence.

When Fechner called the police during the July 31 incident, he reported that Amanda crawled through the window after breaking through the screen. When asked if Amanda was injured, Fechner said, "I don't know why she would've been. No." But Fechner also admitted that it was dark, so he did not know if she was hurt. When the police arrived at Fechner's home, Fechner told a deputy he tried to stop Amanda from coming into the house, but he did not explain how he did so. Fechner denied hitting Amanda and denied that he had any injuries from her. The deputy noted that Amanda had "a pretty good abrasion," but he did not see any injuries on Fechner's hands. The video recording shows that while Amanda was at the window, the screen came off, hitting her. She then lunged forward into the window and immediately recoiled, apparently in pain, and fell to the ground where she remained. Amanda testified that when she reached into the window either to climb inside or to get her phone, Fechner punched her in the face. Defense counsel claimed the video showed Amanda hitting herself on the windowsill, resulting in a "linear" injury that matched the windowsill. Counsel further argued that Fechner never punched her, nor could he have done so given the height difference between Fechner inside the house and Amanda outside.

In California, self-defense and accidental injury to a victim are, in general, treated as inconsistent defenses. (See *People v. Curtis* (1994) 30 Cal.App.4th 1337, 1357-1358.) On appeal, Fechner claims that a reasonable jury could conclude that he needed to defend himself when Amanda "launched fist-first through the window at him," and that he "was using reasonable force to eject a trespasser" and "to defend his real and personal property." Although Fechner argues that his theory at trial with respect to count two *encompassed* self-defense, defense of property, and his right to eject Amanda as a

trespasser, this is inaccurate.[7]  Without citing any authority for this proposition, he contends that because he did not testify that he did not use force against Amanda, there is no inconsistency between the actual and proposed defense theories.  We disagree.

At trial, Fechner argued that Amanda's injury sustained during the July 31 incident was self-inflicted and insisted that he had nothing to do with it.  In contrast, for each prospective alternative theory to apply, Fechner would have had to admit he used force against Amanda.  The court would have then been able to instruct the jury regarding whether Fechner's use of force was justified and therefore a defense to the charge.  (See CALCRIM Nos. 3470 [for self-defense, the jury had to find, in part, that Fechner "used no more force than was reasonably necessary to defend against that danger"], 3476 [allows an owner use of "reasonable force to protect that property from imminent harm"], 3475 [allows the owner to "use reasonable force to make the trespasser leave"].)  Critically, Fechner's current approach requires something that he refused to offer at trial—his admission that he used force against Amanda.  It is clear to us that consideration of whether his use of force was justified is inconsistent with his claim at trial that he did not use force at all.

While a trial court has no sua sponte duty to instruct on defenses that are inconsistent with the defendant's theory of the case (*People v. Sedeno* (1974) 10 Cal.3d 703, 716, overruled on another ground in *People v. Breverman* (1998) 19 Cal.4th 142, 149), counsel's failure to request the alternative defense instructions will not support a claim of ineffective assistance of counsel largely for the same reason:  They would have been inconsistent with Fechner's trial strategy of denying using any force against Amanda.  An *I didn't hit her.  But if I did* . . . defense is a difficult pill to swallow and

---

[7]  We caution counsel not to overstate or misrepresent the record under the cloak of effective advocacy.  "An attorney has an unqualified duty to refrain from acts which mislead the court." (*Jackson v. State Bar* (1979) 23 Cal.3d 509, 513.)

trial counsel was wise not to pursue it.  Such an obvious and reasonable tactical choice defeats any contention counsel performed deficiently.  (See *People v. Diaz* (2023) 97 Cal.App.5th 1172, 1181 [refusing to find ineffective assistance for trial lawyer to fail to request a jury instruction that clashed with her effort to persuade the jury that the defendant had nothing to do with the offense].)

Furthermore, we conclude that substantial evidence does not support the alternative theories as applied to the July 31 incident.  Fechner contends that Amanda's actions in "launch[ing] fist-first through a window" constituted sudden, aggressive conduct that warranted these defenses.  But these are conclusory claims rather than factual support for the defenses.  Even if we were to agree with Fechner's characterization of Amanda's conduct, there was no evidence that she posed an imminent threat to his safety or that of his property such that a jury could consider whether Fechner's use of force was justified.  (See *Minifie, supra*, 13 Cal.4th at p. 1068 [the law of self-defense recognizes the justification of self-defense not because the victim " 'deserved' " what she got, but because the defendant acted reasonably under the circumstances as it appeared to him].)  Fechner's conversations with sheriff's department dispatch and with the officers who responded to the call reveal no concern for his own safety or for that of his property.

With respect to Fechner's right to eject a trespasser, we reach the same conclusion albeit for different reasons.  The right to eject a trespasser applies where the defendant uses reasonable force to exclude someone he or she reasonably believes is trespassing in, or about to trespass in his or her home.  (*People v. Curtis, supra*, 30 Cal.App.4th at p. 1360.)  Thus, CALCRIM No. 3475 applies only when the victim was a trespasser.  A trespasser is a person who enters or remains upon land of another without consent.  (*Hoffmann v. Young* (2022) 13 Cal.5th 1257, 1266; CACI No. 2000; see also Pen. Code, § 602.5 [trespass by entering or remaining in dwelling]; CALCRIM No. 2932.)

17

Here, substantial evidence does not show that Amanda was a trespasser on July 31. Unlike on June 25—where Amanda had a home of her own and she nevertheless came over uninvited—Amanda effectively lived with Fechner on July 31. Mid-July, after Amanda was suddenly denied access to her home, Fechner invited her to stay in his house, and she had been staying with him exclusively for over two weeks. The undisputed evidence was that she had a key and access code to Fechner's house. Thus, between July 12 and July 31, Amanda had permission to stay at Fechner's house with apparently unfettered access, and she was thus not on his property without his consent. While Fechner may revoke that consent at any time, and he argues he tried to do so that night, the evidence shows that any such attempt was equivocal. He initially told her she had 10 minutes to get out of his house, but when Amanda tried to enter the house, he had already locked her out. When she asked to be let inside, he asked whether she would "behave," and when Amanda said "no" he would not let her in. At no point did he ask her to leave the property. Rather, it appears he temporarily denied her access to the house until she agreed to "behave." (See Pen. Code, § 602, subd. (o)(1) [a person commits trespassing by willfully "[r]efusing or failing to leave land, real property, or structures belonging to, or lawfully occupied by, another and not open to the general public, upon being requested to leave by . . . the owner"]; *People v. Wilkinson* (1967) 248 Cal.App.2d Supp. 906, 908 [consent to enter land can be implied as well as express].)

Finally, Fechner contends, "Also a problem—there was no instruction defining trespass." Because this is largely the extent of Fechner's discussion on this point, we need not say more than to conclude that since the instruction on the right to eject a trespasser was unwarranted, logic dictates that the jury would not have benefited from the definition of trespasser.

### iii. Fechner's Claim as to Alternative Theories

Fechner contends that, should we find the alternative defense theories of self-defense, defense of property, or the right to eject a trespasser inconsistent with his

18

defense at trial, we should further conclude that the trial court was required to inquire of Fechner whether he wanted the jury instructed regarding these alternative theories. The People claim that the trial court had no duty to ask Fechner about these alternative defenses. We agree with the People.

In support of his argument, Fechner relies on *Elize, supra*, 71 Cal.App.4th at page 616 and a footnote in *People v. Sedeno, supra*, 10 Cal.3d 703, which states "If it appears to the court, however, that there is substantial evidence that would support a defense inconsistent with that advanced by a defendant, the court should ascertain from the defendant whether he wishes instructions on the alternative theory." (*Sedeno*, at p. 717, fn. 7.) Fechner takes the footnote out of context and in doing so, ignores the actual holding in *Sedeno*.

In *Sedeno*, the California Supreme Court noted that the sua sponte duty to instruct on all material issues presented by the evidence extends to defenses as well as to lesser included offenses, but the court drew a sharp distinction between the two situations. (*People v. Sedeno, supra*, 10 Cal.3d at p. 716.) In the case of defenses, a sua sponte instructional duty arises "only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." (*Ibid*.) As we have stated, *ante*, the evidence did not support these alternative defenses, which in fact were inconsistent with his theory of the case. Thus, the court had no duty to inquire of Fechner regarding these alternative theory instructions. Our review of *Elize* does not convince us otherwise.

In *Elize*, the defendant sought to reverse convictions for assault and battery based on the trial court's failure to instruct the jury on self-defense. (*Elize, supra*, 71 Cal.App.4th at p. 607.) At trial, the defendant testified that at the time he fired a gun, he was in an altercation with two women who were hitting him with iron pipes. (*Id*. at p. 609.) One of them struck a blow breaking his left wrist or arm and, soon thereafter, tried to grab his gun from the holster, while the other continued to hit him on the back.

(*Ibid*.)  At that moment, he tried to point the gun upward when it fired, causing the attackers to flee.  (*Ibid*.)

The appellate court reversed the judgment against the defendant, concluding the record contained sufficient evidence from which a rational jury could find the defendant acted in imperfect self-defense.  (*Elize, supra*, 71 Cal.App.4th at pp. 607, 615-617.)  The court explained:  "A jury could disbelieve [the] defendant's testimony that the gun fired accidentally during th[e] struggle.  A jury could find that [the] defendant fired the gun intentionally, hoping to end the attack upon him either by hitting one of his assailants or by firing into the air to scare off his attackers."  (*Id*. at p. 616.)

In *Elize*, the defendant was actively embroiled in an altercation that objectively suggested he was in imminent danger of serious harm.  (*Elize, supra*, 71 Cal.App.4th at p. 609.)  Although the defendant did not testify to harboring a fear of imminent death or injury, a rational jury could still infer he held that belief for purposes of self-defense based on evidence of surrounding circumstances suggesting a need to defend against imminent peril.  That is not the case here.  The record contains no evidence of surrounding circumstances from which a rational jury could find that Fechner believed he or his property was at risk of imminent peril when he dragged Amanda out of the house in June or punched her in the face in July.  None of Fechner's statements indicated that Amanda had threatened or tried to attack him or his property.  On the record before us, the jury could only speculate as to whether Fechner feared for his safety when Amanda entered his house without his permission in June or lunged through the open window in July.  But that kind of speculation is not substantial evidence.  (See *People v. Sakarias, supra*, 22 Cal.4th at p. 620.)  Indeed, we have previously concluded that substantial evidence does not support the alternative theories of self-defense or defense of property for either count, nor does it support the alternative theory that Fechner was exercising his right to eject a trespasser on July 31.  Because the alternative theories were not supported

20

by substantial evidence, the trial court had no duty to inquire as to whether Fechner wanted the instructions given.

## II

## Client Autonomy

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215; accord, *McCoy v. Louisiana* (2018) 584 U.S. 414, 421 (*McCoy*).) Generally, "[t]rial management is the lawyer's province: Counsel provides his or her assistance by making decisions such as 'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence.' [Citation.] Some decisions, however, are reserved for the client—notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." (*McCoy*, at p. 422; accord, *People v. Frierson* (1985) 39 Cal.3d 803, 812 (plur. opn.) [counsel has "traditional power to control the conduct of a case" but "with respect to certain fundamental decisions in the course of a criminal action, a counsel's control over the proceedings must give way to the defendant's wishes"].) "These are not strategic choices about how best to *achieve* a client's objectives; they are choices about what the client's objectives in fact *are*." (*McCoy*, at p. 422.) "With individual liberty—and, in capital cases, life—at stake, it is the defendant's prerogative, not counsel's, to decide on the objective of his defense: to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt." (*Id*. at pp. 417-418.)

"When counsel overrides a defendant's autonomy on a fundamental decision that is reserved for the client, the defendant's Sixth Amendment rights are violated." (*People v. Palmer* (2020) 49 Cal.App.5th 268, 279, citing *McCoy, supra*, 584 U.S. at pp. 421-422.) "A violation of the client's right to maintain his or her defense of innocence

21

implicates the client's autonomy (not counsel's effectiveness)." (*People v. Eddy* (2019) 33 Cal.App.5th 472, 480.) Accordingly, such an error is structural and not subject to harmless error review. (*McCoy*, at p. 427; *Eddy*, at p. 480.)

We review de novo the legal question of whether a defendant's constitutional rights were violated. (See *People v. Cromer* (2001) 24 Cal.4th 889, 894.)

Fechner claims that defense counsel effectively admitted elements of the offenses, which violated his right to client autonomy under the Sixth Amendment to the federal Constitution. He relies on three United States Supreme Court cases that stand for the proposition that an accused has the ultimate authority to make certain fundamental decisions regarding a case. (See *Jones v. Barnes* (1983) 463 U.S. 745, 751 [the accused has the ultimate authority to make certain fundamental decisions regarding the case: whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal]; *Brookhart v. Janis* (1966) 384 U.S. 1, 7 [the accused's constitutional rights to plead not guilty and have a trial in which he or she can confront and cross-examine the witnesses against him or her cannot be waived by his or her counsel]; *McCoy, supra*, 584 U.S. at pp. 417-418.) We disagree.

To convict Fechner of violating Penal Code section 273.5 as charged, the prosecution had to prove in relevant part that Fechner willfully and unlawfully inflicted a physical injury on his dating partner. (CALCRIM No. 840.) With respect to the June 25 incident reflected in count one, Fechner admitted he used force and inflicted an injury on Amanda but claimed his actions were lawful because he was exercising his right to eject her as a trespasser. With respect to the July 31 incident reflected in count two, Fechner's defense was that he did not hit Amanda and that her injury was self-inflicted when she lunged into the window. Thus, at trial, counsel denied Fechner's guilt as to both charges. "[F]or a Sixth Amendment violation to lie, a defendant must make his intention to maintain innocence clear to his counsel, and counsel must override that objective by conceding guilt." (*In re Smith* (2020) 49 Cal.App.5th 377, 388, citing *McCoy, supra*,

584 U.S. at p. 423.) That did not happen here. As Fechner did not object to counsel's denials on his behalf, nothing in the record indicates counsel was not conveying the objective of his defense. (See *Mccoy*, at p. 420 [framing the issue as "whether it is unconstitutional to allow defense counsel to concede guilt over the defendant's intransigent and unambiguous objection"].) The record here establishes that defense counsel did not concede guilt or pursue an objective of defense other than as desired by Fechner. Thus, the Sixth Amendment was not violated.

In an argument that is difficult to follow, Fechner contends that if defense counsel had pursued the alternative defenses at trial with respect to all counts, the prosecution would have had to prove the *absence* of lawful use of force: self-defense, defense of property, and lawful ejection of a trespasser; these defenses would have then become elements of the offenses. By failing to raise these defenses and seek corresponding instructions, Fechner contends, defense counsel admitted the defenses did not apply and effectively conceded guilt on those "elements." As we have already determined that counsel did not concede guilt, we need not address this contention.

### III

### Prior Incident of Violence

Fechner contends that he was denied his right to a fair trial when the trial court erred in admitting the fall 2021 incident as other crimes evidence, then failed to properly instruct the jury as to defenses to that incident. He also faults defense counsel for failing to make various objections to the evidence.

### A. Additional Background

Prior to trial, the prosecution moved to admit evidence of a prior act to show Fechner's propensity to commit domestic violence under Evidence Code section 1109

23

and as evidence of his intent under Evidence Code section 1101.[8] At a hearing on the motions, the prosecutor provided the following offer of proof. On one fall night in 2021, Amanda stayed overnight at Fechner's house. They argued and Amanda slept on the couch. At around 1:00 a.m., Amanda woke Fechner, told him she was going back to her home, gathered her belongings, and left. Once she reached her home (that was less than a mile away) she realized she forgot her phone and returned to Fechner's home to retrieve it. She repeatedly knocked and rang the doorbell and announced her presence and intent to retrieve her phone. When Fechner did not respond, she went to the back of the house to a door leading directly to Fechner's bedroom. She knocked and announced her presence; Fechner's dog barked. Amanda opened the door with a key. The lights were on, and she saw Fechner in the room pointing a gun at her. He accused her of breaking into his house and threatened to call the police.

Defense counsel argued that there was no proof that Fechner, who wears hearing aids, was aware that it was Amanda at the back door. He contended that Fechner had a reasonable fear his home was being broken into and exercised his right to defend himself. He also argued that even if Fechner failed to put the gun down upon recognizing Amanda, that act did not amount to domestic violence.

At the hearing, the trial court noted that a person has a right to defend their home but ruled that "once [Fechner] learned it was the alleged victim and continued to point a gun at her, then the Court would find that is domestic violence." In its written rulings, the trial court noted the parties disagreed as to whether Fechner believed Amanda was an intruder and ruled that the incident was admissible under sections 1101 and 1109, "assuming a proper evidentiary foundation is established." The trial court also ruled, "the

---

[8] Undesignated statutory references are to the Evidence Code.

probative value of the evidence is not substantially outweighed by the risk of undue prejudice."

At trial, Amanda testified in a manner that largely conformed to the offer of proof. She testified that she used her key to open the back door to Fechner's bedroom "a little bit" and saw that the bedroom light was on, and Fechner was holding a firearm. He said, "don't move. I'm going to shoot." Amanda said, "it's me. It's Amanda." Fechner said, "I have a gun. I'm going to call the police. Intruder, intruder." Amanda could see Fechner's eyes.

Although Amanda testified that Fechner knew she was at the door while he pointed the gun at her, several out-of-court statements were also introduced regarding that incident. In an e-mail to Fechner on June 26, 2022, Amanda referenced this incident by recounting that he "pointed a gun at [her] head 3 months into [their] relationship." In contrast, an e-mail sent from Amanda's account on July 14, 2022, included the statement "[Fechner] never put a gun to my head . . . Once he knew it was me, we were fine." Amanda denied writing the July 14 e-mail; she testified that Fechner wrote the e-mail from her account. About a year after the incident, Amanda told law enforcement that once Fechner realized it was her, he stopped pointing the gun at her and that he said he did not know it was her.

B. Analysis

In general, evidence of a person's character or trait of character is inadmissible to prove that person's conduct (§ 1101, subd. (a)). However, one exception to this rule exists when a defendant is accused of an offense involving domestic violence; evidence that the defendant committed other uncharged acts of domestic violence is admissible to show the defendant has a propensity to commit acts of domestic violence. (§ 1109, subd. (a)(1); *People v. Brown* (2011) 192 Cal.App.4th 1222, 1232.) Another exception is when the evidence is offered to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident (§ 1101, subd. (b)). The

25

admissibility of evidence under sections 1101 and 1109 is limited by section 352, which provides trial courts with broad discretion in weighing the probative value of proffered evidence against its prejudicial effect. (§ 352; see also *People v. Mendoza* (2007) 42 Cal.4th 686, 699; *People v. Winkler* (2020) 56 Cal.App.5th 1102, 1143.)

"[O]ther crimes evidence need be proven only by a preponderance of the evidence." (*People v. Steele* (2002) 27 Cal.4th 1230, 1245, fn. 2.) Under section 403, subdivision (a), the trial court must first determine by a preponderance of the evidence the existence of the prior uncharged act and the defendant's connection to it as preliminary factual issues before the prior misconduct can be deemed admissible. (See *People v. Cottone* (2013) 57 Cal.4th 269, 284; *Huddleston v. United States* (1988) 485 U.S. 681, 689 [uncharged offense evidence "is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor"]; *People v. Mani* (2022) 74 Cal.App.5th 343, 369 (*Mani*) [applying § 403 to evidence admitted under both §§ 1109 & 1101 theories].) "[I]f the prior and defendant's connection to it are not established by a preponderance of the evidence, the prior is irrelevant to prove the . . . fact for which it is being offered." (*People v. Garelick* (2008) 161 Cal.App.4th 1107, 1115.) Thus, in the context of this case, the court had a duty to determine whether there was sufficient evidence to determine if Fechner committed a prior act of domestic violence when he pointed a gun at Amanda as she tried to enter his home in the fall of 2021.

"We review the trial court's evidentiary rulings for abuse of discretion." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 405.)

Fechner contends that before the trial court could admit evidence of the fall 2021 incident it was first required to determine whether Fechner actually knew it was Amanda when he pointed the gun at her. He further contends that the prosecution failed to establish this preliminary fact—either through the offer of proof or trial testimony—and the trial court should have excluded the evidence as irrelevant. Fechner also contends

26

counsel provided ineffective assistance in allowing the jury to consider this evidence as domestic violence.

### i. Forfeiture

The People claim that Fechner forfeited his challenge to the admission of evidence of this incident because he failed to specifically object under section 403 or to the adequacy of the prosecutor's offer of proof or to the sufficiency of Amanda's testimony.

We need not resolve this issue, however, as we will consider the merits of his claim as necessary to resolve his contention that counsel's failure to object constituted ineffective assistance and his claim of instructional error.

### ii. Preliminary Fact

"Sometimes the relevance of evidence depends on the existence of a preliminary fact. (Evid. Code, § 403, subd. (a).)" (*People v. Lucas* (1995) 12 Cal.4th 415, 466 (*Lucas*).) We agree with Fechner that admission of a defendant's prior bad acts under section 1101 or 1109 requires a preliminary determination, by a preponderance of the evidence, that the defendant in fact committed those acts. (See *People v. Garelick, supra*, 161 Cal.App.4th at p. 1115; *People v. Simon* (1986) 184 Cal.App.3d 125, 129-132; § 403 [determination of preliminary facts].) Section 1109 provides that " '[d]omestic violence' " "has the meaning set forth in Section 13700" and "as set forth in Section 6211 of the Family Code." (§ 1109, subd. (d)(3).) As relevant here, Penal Code section 13700 defines " '[a]buse' " as "placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." (Pen. Code, § 13700, subd. (a).) There is no doubt that pointing a gun at a person with whom you have or had a dating relationship while calling that person an "intruder" would place that person in reasonable apprehension of serious bodily injury and thus could constitute domestic violence.

Fechner notes, however, the intent behind these actions is different depending on his knowledge (or lack thereof) of the identity of the potential intruder. Fechner claims that this factual issue was key to the admissibility of the evidence. According to him,

27

because there was no evidence beyond Amanda's speculation that he knew it was she who was trying to gain access to his home, the incident cannot be deemed to be one of domestic violence and the court erred in admitting it as such under both sections 1101 and 1109.

Fechner overstates the threshold requirement. Preponderance of the evidence means " ' "that the evidence on one side outweighs, preponderates over, is more than, the evidence on the other side, not necessarily in number of witnesses or quantity, but in its effect on those to whom it is addressed." ' " (*Li v. Superior Court* (2021) 69 Cal.App.5th 836, 853, italics omitted.) The court should exclude the proffered evidence only if the " 'showing of preliminary facts is too weak to support a favorable determination by the jury.' " (*Lucas, supra*, 12 Cal.4th at p. 466.) Both the offer of proof and Amanda's testimony met this threshold. According to Amanda, she woke Fechner to tell him she was leaving and she was only gone between five and 11 minutes before she returned for her phone. When she returned, she rang the doorbell, knocked, and called out to Fechner to alert him to her presence. By the time she went around the house to use her key in the back door, Fechner's bedroom light was on, and his dog was inside barking. When she opened the door, she could see Fechner pointing a gun at her. After she again declared her identity, according to both the offer of proof and her testimony, he continued to point the gun at her. Contrary to Fechner's claims, this constituted sufficient evidence to allow the jury to determine whether there was a preponderance of evidence that Fechner committed an act of domestic violence before it could consider it for any purpose. (*Lucas*, at p. 467 [in making the preliminary fact determination under § 403, the court's role " 'is merely to determine whether there is evidence sufficient to permit a jury to decide the question' "].)

28

We acknowledge there were challenges to Amanda's credibility with respect to her claim that Fechner knowingly pointed the gun at her.[9] Yet this does not change the analysis regarding the admissibility of the evidence. In attempting to show that Fechner inflicted corporal injury on Amanda, the prosecutor was allowed to present evidence that Fechner had a history of domestic violence. (See *Lucas, supra*, 12 Cal.4th at p. 467 [where a good faith basis for the existence of a preliminary fact exists, the prosecutor is entitled to try to establish this foundation].)

Moreover, the trial court has the preliminary, but not the final, authority to determine the question of the existence of the preliminary fact under section 403. "The[se] questions involve the credibility of testimony or the probative value of evidence that is admitted on the ultimate issues. It is the jury's function to determine the effect and value of the evidence addressed to it.' " (*Lucas, supra*, 12 Cal.4th at pp. 466-467.) Thus, any conflict in Amanda's account of that night was for the jury to resolve and went to the weight, not admissibility, of the evidence. (Cf. *People v. Brown, supra*, 192 Cal.App.4th at p. 1233 ["evidence of a prior act may be introduced as propensity evidence even if the defendant was acquitted of criminal charges based upon that act"].)

In short, because we find sufficient evidence exists to support the finding that the preliminary fact was established by a preponderance of the evidence, we conclude the following with respect to Fechner's contentions. Neither counsel nor the court were obligated to seek or hold a hearing pursuant to section 402. (Cf. *People v. Galambos* (2002) 104 Cal.App.4th 1147, 1157 [hearing pursuant to § 402 "is more commonly used to determine, for instance, the existence of a privilege, the qualification of a witness, the

---

[9]    However, Fechner's claim that the record shows Amanda referred to the incident as an "accident" is inaccurate. She testified that when he pointed the gun at her, she realized "this is how people probably get shot and—on accident and so . . . I was in shock because I knew in God's name he knew it was me."

29

admissibility of a confession, or the authenticity of a writing"]; see also §§ 400, 402, subd. (b), 403, subd. (a)(2), (3).) The trial court did not abuse its discretion in admitting the evidence and did not err in failing to instruct the jury to disregard the evidence. (See *Lucas, supra*, 12 Cal.4th at pp. 467-468 [duty to instruct jury to disregard evidence when court determines jury could not find existence of preliminary fact]; § 403, subd. (c)(2).) Nor was counsel ineffective for failing to object on these bases. (*People v. Bradley* (2012) 208 Cal.App.4th 64, 90 ["Failure to raise a meritless objection is not ineffective assistance of counsel"].)

### iii. Degree of Similarity

Fechner contends that the trial court abused its discretion in admitting the 2021 incident pursuant to sections 1101, subdivision (b) and 1109 because that incident was too dissimilar to the charged offenses.

Subdivision (b) of section 1101 provides that "evidence of a prior uncharged act may also be admissible to prove a disputed material fact—other than a criminal disposition—such as motive, intent, knowledge, or the absence of mistake or accident." (*People v. Wang* (2020) 46 Cal.App.5th 1055, 1075.) Our high court has stated: "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] . . . [Citation.] In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." ' " (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402.) "[T]he similarities between the two events must be substantial enough to have probative value." (*People v. Winkler, supra*, 56 Cal.App.5th at p. 1145.)

Fechner emphasizes that the prior incident involved a firearm in the middle of the night whereas the charged offenses do not. This fails to address the prosecution's trial theory that the incidents were similar because they involved the same victim and the same pattern: Fechner had a history of accusing Amanda of breaking into his home in

order to justify his act of domestic violence. Any differences in how he did so in the three incidents were insignificant compared to the fact that he victimized the same person, at the same place, and the conduct followed a similar pattern. In the context of this case, these similarities were substantial enough to have sufficient probative value. (See generally *Mani, supra*, 74 Cal.App.5th at pp. 351-353, 367-369 [rejecting the defendant's argument that differences between the prior acts and the charged offenses, such as the time of day and the fact that he previously only entered the attached garage and not the residence itself, as well as his inconsistency in being armed, rendered the prior acts too dissimilar for admissibility under § 1101, subd. (b)]; *People v. Fruits* (2016) 247 Cal.App.4th 188, 203-204 [evidence of prior threats the defendant made against his mother, and other prior acts of violence against her were similar to the charged offense involving his mother and thus highly probative]; *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1029 [§ 1109 evidence relevant to domestic violence was admissible in view of the fact that the evidence involved the defendant's history of similar conduct against the same victim and the evidence was not unduly inflammatory].)

Fechner also contends, "The analysis . . . would be no different concerning application of section 1109. Under that section the prosecutor must make a preliminary showing that the fall 2021 incident was 'domestic violence.' " We have already concluded that the evidence supporting the preliminary fact that Fechner committed a prior act of domestic violence was sufficient for the jury's consideration. Fechner's failure to provide any additional legal analysis or factual support for his conclusory claim that the court abused its discretion in admitting the evidence pursuant to section 1109 waives the claim. (See *People v. Stanley, supra*, 10 Cal.4th at p. 793.)

*iv. Section 352*

Fechner contends that in conducting its analysis pursuant to section 352, the trial court failed to consider the degree of certainty of its commission. He contends that the prior act constituted domestic violence only upon a showing that Fechner knew he

pointed the gun at Amanda and because the evidence on this point was not conclusively established, the court erred in admitting the evidence.

As previously noted, evidence admissible pursuant to sections 1101 and 1109 is still subject to a determination that, "pursuant to section 352, whether the probative value of the evidence is substantially outweighed by the probability the evidence will consume an undue amount of time or create a substantial danger of undue prejudice, confusion of issues, or misleading the jury." (*People v. Brown, supra*, 192 Cal.App.4th at p. 1233.) "In conducting the careful weighing process to determine whether propensity evidence is admissible under section 352, trial courts 'must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission.' " (*People v. Kerley* (2018) 23 Cal.App.5th 513, 535.)

While Fechner is correct that one consideration in the section 352 analysis is "the degree of certainty with which the prior instances of domestic violence occurred" (*People v. Kerley, supra*, 23 Cal.App.5th at p. 537), it remains the case that "corroboration is not a requirement" (*Mani, supra*, 74 Cal.App.5th at p. 372). And although Fechner claims the court's written ruling shows it did not consider the degree of certainty that the prior act occurred because that factor was not mentioned, a trial court need not indicate that it did so. " '[A] court need not expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing functions under Evidence Code section 352.' " (*People v. Doolin* (2009) 45 Cal.4th 390, 438; see also *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1315 [a trial court need not expressly state that it has weighed prejudice against

probative value].) In considering the record as a whole, Fechner has not persuaded us that the trial court did not understand and fulfill its responsibilities under section 352.

Fechner further contends that the introduction of the prior act was extremely prejudicial because it involved his use of a firearm. In support, Fechner relies on two cases for the general proposition that evidence of weapons may be prejudicial, but he offers no legal argument as to how these cases apply to the facts of this case. We are not bound to develop Fechner's argument for him. (See *Sviridov v. City of San Diego* (2017) 14 Cal.App.5th 514, 521.) Here there was evidence of Fechner's and Amanda's gun ownership throughout the case, and we cannot simply conclude that the prior act of domestic violence was overly prejudicial because it involved a firearm.

### v. Due Process

Fechner contends the introduction of the prior act as propensity evidence violated due process. In support, he relies on *Garceau v. Woodford* (9th Cir. 2001) 275 F.3d 769, 774-775, reversed (2003) 538 U.S. 202. "Decisions of federal district or appellate courts are not binding on us in the absence of a United States Supreme Court decision that is on point." (*People v. Racklin* (2011) 195 Cal.App.4th 872, 877.) Moreover, since its enactment, due process challenges to section 1109 have been repeatedly rejected. (See, e.g., *Mani, supra*, 74 Cal.App.5th at pp. 375-376; *People v. Cabrera* (2007) 152 Cal.App.4th 695, 703-704 [the trial court's discretion to exclude propensity evidence under § 352 saves § 1109 from a defendant's due process challenge]; *People v. Brown* (2000) 77 Cal.App.4th 1324, 1334 [same]; *People v. Johnson* (2000) 77 Cal.App.4th 410, 419.) Proper application of section 1101, subdivision (b) likewise does not implicate due process. (*People v. Merchant* (2019) 40 Cal.App.5th 1179, 1194; see also *People v. Thompson* (2016) 1 Cal.5th 1043, 1116 [the routine application of §§ 1101 & 352 does not implicate a defendant's constitutional rights].) Fechner fails to address this well-established precedent and provides no reason for us to deviate from it. As we have

33

concluded that the trial court did not abuse its discretion under section 1101 or 352, Fechner's constitutional rights are not implicated.

### vi. *Instructions Regarding Defenses to Prior Act Allegations*

Fechner contends the court had a sua sponte duty to instruct on several defenses as applied to the prior act of domestic violence and erred in failing to do so. There is no sua sponte duty to instruct on other acts of domestic violence. (*People v. Najera* (2008) 43 Cal.4th 1132, 1139.) Indeed, the California Supreme Court has recently provided guidance on this issue in an analogous case. In *People v. Barrett* (2025) 17 Cal.5th 897, 949, the defendant, accused of murdering his prison cellmate, introduced evidence of the victim's prior violent conduct. In response, the court admitted evidence of the defendant's character for violence under section 1103. (*Barrett*, at p. 952.) The court instructed the jury that such evidence " 'can only be used by you pursuant to the Evidence Code to show whether or not [defendant] has a character for violence or a trait of character for violence. It cannot be used to show he has a propensity to commit violent crimes.' " (*Ibid*.) The trial court refused defense counsel's request to instruct the jury that the defendant's testimony " 'of the conduct of [the victim] . . . was for the limited purpose of showing that [defendant] had no knowledge that he had [snitched]' " thus providing a motive for killing the victim. (*Ibid*.) On appeal from his conviction, the Supreme Court rejected the defendant's contention that the trial court's instructions " 'unfairly permitted the jury to consider other crimes evidence in determining whether [the defendant]—but not [the victim]—had a violent character.' " (*Id*. at p. 957.) The court explained, " '[a] defendant is entitled to a pinpoint instruction, upon request, only when appropriate. [Citation.] "Such instructions relate particular facts to a legal issue in the case or 'pinpoint' the crux of a defendant's case . . . . [Citation.] They are required to be given upon request when there is evidence supportive of the theory, but they are not required to be given sua sponte." ' [Citation.]" (*Ibid*.) Because the defendant did not specifically request a pinpoint instruction to the effect that the victim's prior violence

could be considered as relevant to the question of whether he acted in conformity therewith on the night of his death, the defendant was not entitled to a pinpoint instruction regarding the victim's violent character, and he could not complain that the jury instructions were unfair in that regard.  (*Ibid*.)  So too here.  In light of this, and without any legal authority or analysis in support of his contention, we see no reason to require the trial court to instruct a jury on defenses to prior acts of domestic violence when it has no sua sponte duty to instruct on the prior act in the first instance.

DISPOSITION

The judgment is affirmed.


_____/s/_____
EARL, P. J.


We concur:



_____/s/_____
HULL, J.



_____/s/_____
FEINBERG, J.


35